IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Venisha Mary Bass,                    )        Civil Action No. 8:15-cv-03659-BHH-JDA
                          Plaintiff,  )
                                      )        **REPORT AND RECOMMENDATION**
                                      )        **OF MAGISTRATE JUDGE**
               vs.                    )
                                      )
Carolyn W. Colvin,                    )
Commissioner of Social Security,      )
                                      )
                        Defendant.    )

        This matter is before the Court for a Report and Recommendation pursuant to Local

Civil Rule 73.02(B)(2)(a), D.S.C., and Title 28, United States Code, Section 636(b)(1)(B).[1]

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final

decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's

claim for disability insurance benefits ("DIB").  For the reasons set forth below, it is

recommended that the decision of the Commissioner be affirmed.

## PROCEDURAL HISTORY

        On October 5, 2012, Plaintiff protectively filed an application for DIB, alleging an

onset of disability date of May 1, 2012.  [R. 88.]  The claim was denied initially and on

reconsideration by the Social Security Administration ("the Administration").  [R. 88,

217–18.]  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and on

---

        [1]A Report and Recommendation is being filed in this case, in which one or both parties
declined to consent to disposition by a magistrate judge.

February 19, 2014, ALJ Carl B. Watson conducted a de novo hearing on Plaintiff's claims. [R. 101–29.]

The ALJ issued a decision on June 13, 2014, finding Plaintiff not disabled through the date of the decision.  [R. 96.] The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act ("the Act") through December 31, 2014. [R. 90, Finding 1.]  At Step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 1, 2012, the alleged onset date. [*Id*., Finding 2.] At Step 2, the ALJ found Plaintiff had the following severe impairments: borderline intellectual functioning, attention deficit hyperactivity disorder (ADHD), and gastroesophageal reflux with vocal cord blisters. [*Id*., Finding 3.] The ALJ determined that for Plaintiff the following were nonsevere impairments: history of breast cancer, insomnia, anemia, right liver lobe lesion, depression, and anxiety. [R. 90–91.]

At Step 3, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). [R. 91.] The ALJ specifically considered listings 5.00 (digestive disorders), 2.09 (vocal cord blisters), 12.02, 12.04, and 12.06 (mental).

Before addressing Step 4, the ALJ determined Plaintiff had ". . . the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, repetitive tasks in an environment where changed (sic) are infrequent and introduced gradually; and she must avoid work that involves constant verbal communications." [R. 92.] At Step 4, based on testimony from a vocational expert ("VE"), the ALJ determined that Plaintiff had the residual

2

functional capacity ("RFC") to perform the requirements of her past relevant work ("PRW") as a housekeeper. [R. 96.] Thus, on that basis, the ALJ determined that Plaintiff had not been under a disability as defined by the Act from May 1, 2012, through the date of the decision. [R. 96.]

Plaintiff requested Appeals Council review of the ALJ's decision and submitted additional evidence, and the Council declined. [R. 1–6.] Plaintiff filed this action for judicial review on September 11, 2015. [Doc. 1.]

### THE PARTIES' POSITIONS

Plaintiff argues that substantial evidence does not support the ALJ's decision, and thus, this Court should reverse and remand it. [Doc. 25 at 1–11.] Specifically, Plaintiff argues the ALJ erred by: (1) finding Plaintiff could perform her PRW in housekeeping; (2) finding Plaintiff's borderline intellectual functioning did not limit her ability to work and failing to ask the VE how Plaintiff's borderline intellectual functioning would have affected her ability to work; and (3) failing to consider Plaintiff's genetic mutation analysis. [*Id*. at 6.] Also, Plaintiff argues "the Appeals Council should have considered additional records that were submitted." [*Id*.]

The Commissioner contends that substantial evidence supports the ALJ's decision, such that Plaintiff's RFC was correct and Plaintiff could have performed her PRW. [Doc. 27.] Also, the Commissioner argues the Appeals Council did not err when deciding to deny Plaintiff's request for review. [*Id*.]

The Court agrees with the Commissioner.

**STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment

4

for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual

functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).   Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.   *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").   After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction.   *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).   A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the

determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[2]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

---

[2]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 404.1520. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. &*

8

*Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the

9

[Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B).

### C.     *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d).

### D.     *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[3] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. § 404.1560(b).

---

[3]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior

work, the burden of proof shifts to the Commissioner to establish that the claimant could

perform other work that exists in the national economy.  *See Hunter v. Sullivan*, 993 F.2d

31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g).    To meet this burden, the

Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the

"grids").    Exclusive reliance on the "grids" is appropriate where the claimant suffers

primarily from an exertional impairment, without significant nonexertional factors.[4]  20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929,

930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases

involving exertional limitations).    When a claimant suffers from both exertional and

nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.

In such a case, the Commissioner must use a vocational expert to establish the claimant's

ability to perform other work.  20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50

("Because we have found that the grids cannot be relied upon to show conclusively that

claimant is not disabled, when the case is remanded it will be incumbent upon the

[Commissioner] to prove by expert vocational testimony that despite the combination of

---

[4]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 404.1569a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  § 404.1569a(c)(1).

exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270

F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a

claimant is disabled. 20 C.F.R. § 404.1527(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 404.1517. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree,

14

alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...

15

>**FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such

determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor. But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Residual Functional Capacity and Past Relevant Work**

By arguing the ALJ did not properly consider Plaintiff's borderline intellectual functioning related to her ability to work or Plaintiff's genetic mutation analysis, she apparently is arguing that the RFC was incorrect. Plaintiff further alleges that she could not perform her PRW of housekeeping "due to her chronic hoarseness, anemia, borderline intellectual functioning and the problems she has had in connection with her breast cancer." [Doc. 25 at 7.] This argument seems to be that nonsevere impairments, such as anemia and history of breast cancer, were not properly accounted for in the RFC. Plaintiff also contends that limiting her to simple repetitive tasks was insufficient to account for her mental retardation. [Doc. 30 at 2.]

As discussed below, the Court finds that the ALJ properly considered Plaintiff's functional mental and physical limitations that were supported by evidence in the record.

### *Relevant Medical Evidence*

Plaintiff alleged that her onset of disability date was May 1, 2012, due to "impairments of vocal cord blisters/hoars[e]ness, borderline intellectual functioning, attention deficit hyperactive disorder (ADHD), and acid reflux." [Doc. 25 at 2.]

Plaintiff was treated by her primary care physician, David Robinson ("Dr. Robinson"), on May 25, 2012, for anemia, voice hoarseness, fatigue and breast cancer screening. [R. 312.]  Plaintiff saw Dr. Robinson on June 25, 2012, for follow up on reoccurring hoarseness, chronic fatigue, abnormal mammogram, and anemia. [R. 309.] She reported no obvious heartburn or acid reflux symptoms, and she appeared in no acute distress, alert and oriented, intact cognition. [R. 310.] She was advised to take Claritin and an iron replacement. [R. 309.]

On August 6, 2012, Plaintiff had a follow up for GERD and hoarseness; it was noted that she had seen an ENT. [R. 307.] On August 15, 2012, Dr. Robinson removed skin tags from Plaintiff; hoarseness was not reported. [R. 304–05.] It was noted that Plaintiff was cooperative, had fluent speech, normal thought process, attention, mood, and concentration. [*Id.*] Plaintiff reported anxiety, and Dr. Robinson prescribed mirtazapine. [*Id.*]

On September 5, 2012, Plaintiff saw Dr. Robinson, and she reported hoarseness, and Dr. Robinson prescribed an increase of omeprazole. [R. 302.] Plaintiff reported that her anxiety seemed better with the mirtazapine, and she was concerned about finding a job with her persistent hoarseness. [*Id.*]

On February 21, 2013, Plaintiff returned to Dr. Robinson, and she complained of fatigue; he noted her history of low iron levels and she was on iron replacement therapy. [R. 373–75.] Dr. Robinson noted that Plaintiff was under the care of Dr. Lentsch at MUSC

18

for chronic reflux and hoarseness; and she continued to have reflux symptoms with some overall improvement. [*Id*.]

On July 26, 2012, Plaintiff saw Eric J. Lentsch, MD of MUSC ("Dr. Lentsch"), an otolaryngologist, for an evaluation of hoarseness that she had for about one year; she explained that it was worse in the morning and sometimes lasted all day. [R. 341.] She explained she was placed on a low acid diet which had been helpful; she had no pain when swallowing or speaking. [*Id*.] She was taking iron and omeprazole. [*Id*.] Dr. Lentsch performed a flexible laryngoscopy on Plaintiff; he made the following findings—vocal cords are mobile; no polyps or growths; mildly edematous cords. [R. 342.]

On September 6, 2012, Plaintiff saw Dr. Lucinda Halstead at MUSC, with the speech language department, based on a referral of Dr. Lentsch; the referral was for a voice evaluation and treatment due to persistent hoarseness for the past year. [R. 350.] It was noted that Plaintiff was alert and oriented with no limitations to learning. [*Id*.] She was trained to increase water intake and eliminate abusive behaviors including yelling, excessive volume and throat clearing. [R. 351.] Dr. Halstead noted Plaintiff had "severe dysphonia secondary to TVC nodules and the resulting maladaptive compensatory behaviors that accompany TVF nodules." [*Id*.]

On September 13, 2012, Plaintiff saw Dr. Halstead, and she had a decline in voice quality marked by strain and absent breath flow. [R. 352.] On March 1, 2013, Dr. Halstead performed a functional evaluation of the larynx on Plaintiff. [R. 387–88.] She had a reduction of the polyp on the right vocal fold but left vocal fold polyp was unchanged. [R. 388.] Dr. Halstead stated that the vocal exercises and reflux medications are working, but to have complete resolution she may need vocal fold surgery. [*Id*.]

19

On September 11, 2013, Dr. Daynna Wolff, Ph.D., with MUSC, conducted a cytogenetics test on Plaintiff; it had not been cleared or approved by the U.S. Food and Drug Administration. [R. 446.] The result stated "2q37.3 - Duplicated"; this duplication was reported in Plaintiff's child; it was recommended to see a genetic counselor to learn more about the condition, its causes and risks. [*Id.*]

On October 2, 2013, Plaintiff saw Rick Olson, MD ("Dr. Olson"), with MUSC.  Dr. Olson's genetics comprehensive note stated that Plaintiff had a mutation identified as duplication of 2q37.3 of unknown significance, and she denied "any medical concerns at this time." [R. 471.]  Her medical history was of mild mental retardation, iron deficiency anemia, GERD with secondary vocal paralysis, and GI dysmotility. [*Id.*] Dr. Olson stated that Plaintiff had duplication of 2q37.3 associated with learning disabilities, mental and learning disabilities. [R. 472.]

### Educational Records

On July 3, 1988, the Orangeburg County School District #3 had a psychoeducational evaluation performed on Plaintiff, who was in tenth grade and 16 years, 7 months old, for the purpose of reevaluation to determine continued eligibility in a program for the handicapped. [R. 393–97.]  The Wechsler Adult Intelligence Scale found Plaintiff as having an IQ of 71. [R. 393–94.] Several other tests were given to Plaintiff, and the result was that Plaintiff's verbal and non-verbal mental ability was in the educable mentally handicapped range; her academic achievement was below average. [R. 396.] The report stated that the school program should continue to be geared toward practical endeavors with a heavy vocational and socialization flavor; considerable practice and role playing should be done in applying for jobs. [*Id.*]

### ALJ's Consideration of Plaintiff's RFC

The ALJ discussed the following with respect to Plaintiff's relevant medical records.

> June 2012 primary care treatment notes document that the claimant had an abnormal mammogram and was recommended to have a repeat mammogram in 6 months. She was also assessed with anemia, hoarseness, and fatigue. August 2012 treatment records reveal that the claimant's hoarseness was assessed as likely due to gastroesophageal reflux disease (GERD). When she returned about a week later for removal of skin tags from her neck, the claimant reported anxiety symptoms and insomnia, for which she was prescribed Mirtazapine. As of September 2012, the claimant's anxiety and insomnia had improved. She noted some improvement of her symptoms of GERO but continued hoarseness. The claimant was concerned about finding a job with her persistent hoarseness (Exhibit 2F).

> In August 2012, the claimant presented to Lucinda Halstead, M.D., for evaluation. She reported a one-year history of hoarseness, which was intermittent in nature. She stated that the hoarseness adversely affected her life because she had to repeat herself and strain to be heard on a daily basis. Her voice was unpredictable and fluctuated. The claimant underwent a rod lens laryngoscopy with stroboscopy, which revealed muscle tension dysphonia and bilateral vocal fold nodules/polyps. She was started on Baclofen and referred for voice evaluation and therapy (Exhibit 3F).

> The claimant underwent a voice evaluation in August 2012, stating that she was actively seeking employment and admitting that she had heavy vocal demands such as yelling, screaming, and excessive phone use. She was assessed with severe dysphonia characterized by hoarseness and rouglmess, consistent with her diagnosis of bilateral true vocal cord nodules. She was noted to have developed maladaptive behaviors in an attempt to compensate for her condition. Participation in an intensive voice remediation program was recommended. September 2012 progress notes reflect that the claimant was trained regarding increased water intake and eliminating abusive behaviors including yelling, excessive volume, and throat clearing. Later in September, the claimant reported some improvement, noting that her voice was normal for two weeks prior to the appointment. In October 2012, the

21

claimant presented with a decline in vocal quality marked by strain and reduced breath flow. She endorsed increased stress and admitted frequent periods of yelli ng at her son (Exhibit 3F).

The claimant returned to Dr. Halstead in October 2012, reporting no improvement in her hoarseness despite compliance with medication and voice exercises. She stated that she could not avoid raising her voice all of the time due to the strains of her children. The claimant was referred for additional testing (Exhibit 3F).

The claimant followed up with her primary care physician, David Robinson, M.D., in December 2012. She reported that although she continued to have some hoarseness, her overall voice quality was improved. Also, her anxiety and insomnia were improving. On primary care follow up in February 2013, the claimant complained of a headache and fatigue. Although she was receiving specialist treatment for her reflux and hoarseness with some improvement, the claimant stated that her reflux symptoms continued to limit her and prevent her from working. Her main complaint was fatigue. The claimant's iron therapy for anemia was continued (Exhibit 6F).

The claimant followed up with Dr. Halstead in March 2013, reporting continued hoarseness, but stating that she used her voice all the time. The impedance pH probe showed that the Prilosec provided excellent acid suppression and the claimant had complete bolus clearance on her manometry. It was unclear why she had burning in her throat. A repeat laryngoscopy revealed a reduction in the right vocal polyp, but no change in the left vocal fold polyp. The claimant's voice quality continued to be assessed as very dysphonic. D r . Halstead recommended vocal fold surgery, but noted that the claimant's reflux must by symptom free prior to performing that surgery. Additionally, the claimant would require 2 weeks of complete voice rest after her surgery (Exhibit 7F). The claimant testified that her vocal cord surgery was postponed due to the discovery and subsequent treatment of her breast cancer. However, she has remained able to communicate despite her intermittent hoarseness. The restriction against work that involves constant verbal communication is therefore appropriate to accommodate the claimant's speech difficulty.

> In January 2014, David W. Robinson, M.D., the claimant's primary care physician, completed a statement for purposes of an application for a disabled placard indicating that the claimant temporarily had an inability to walk ordinarily one hundred feet nonstop without aggravating an existing medical condition, including the increase of pain. Dr. Robinson noted that this condition was temporary and expected to last for 6 months (Exhibit 11F). The undersigned has considered this opinion and accorded it little weight, as it specifically stated that it applied to a period of less than 12 months. Further, there are no treatment records with objective findings documenting a medical impairment that would reasonably limit the claimant to walking no more than 100 feet.

[R. 94–95.]

The ALJ discussed the following with respect to Plaintiff's educational records related to her mental handicap.

> Orangeburg County School District records reflect that the claimant received special education services in a self-contained class for students classified as educable mentally handicapped in high school. On evaluation in 198 , she exhibited a disfluent pattern of speech. On the Wechsler Adult Intelligence Scale - Revised (WAIS-R), the claimant obtained a verbal IQ score of 71, a performance IQ score of 73, and a full scale IQ score of 71 (Exhibit 8F). The undersigned has considered this evaluation in finding that the claimant exhibits borderline intellectual functioning. Although she was classified as educable mentally handicapped, the claimant's most recent IQ scores and her work history reflecting the ability to work at the level of substantial gainful activity demonstrate ability inconsistent with a finding of an intellectual disability. The claimant's borderline intellectual functioning reasonably limits her to the performance of simple, routine, repetitive tasks in an environment where changes are infrequent and are introduced gradually.

[R. 95.]

With respect to Plaintiff's credibility, her activities of daily living, and hearing testimony, the ALJ stated:

23

In January 2013, the claimant answered the phone with a strong loud voice. She reported that she was having a good day but that her voice problems flared every 4 days, lasting for a day at a time. The acid reflux has improved with medication and dietary modification. The claimant described daily activities including preparing breakfast, driving one of her children to and from school, cooking, doing laundry, and cleaning the house. She went grocery shopping once a month, attended church regularly, and helped prepare food whenever there was a special event at church. The claimant attended her son's football and basketball games. She lost her most recent job when she took time off after her mother passed away. When asked about her history of cancer, her anemia, and her anxiety, the claimant reported that her treatments seemed to be working (Exhibit 1A).

At the hearing, the claimant testified that she has difficulty reading. She has blisters on her vocal chords due to acid reflux, which causes her voice to be hoarse all day. Occasionally, the claimant has times that she is unable to talk at all. Her speech difficulty interferes with her ability to obtain and maintain a job. The claimant lives in an apartment with her three children, ages 9, 13, and 18. The oldest child helps the others with their homework and the 13-year-old cleans the house. The claimant cannot stand long and has difficulty using her right arm since her cancer surgery. She is unable to perform household chores. Due to her anxiety and speech problems, the claimant mostly stays home. However, she attends church on Sunday and Bible study on Wednesday.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The undersigned notes that the claimant's hearing testimony was inconsistent with her January 2013 description of her daily activities and physical abilities. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

[R. 93.]

### Discussion

The Administration has provided a definition of RFC and explained what a RFC assessment accomplishes:

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. . . .

SSR 96–8p, 61 Fed.Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted). The RFC assessment must first identify the claimant's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. *See id.* Only after this identification and assessment may RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy. *Id.* Additionally, the Administration has determined that in assessing RFC, the ALJ

> must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities

> in his or her past relevant work (e.g., lifting heavy weights.)
> Age and body habitus (i .e., natural body build, physique,
> constitution, size, and weight, insofar as they are unrelated to
> the [claimant]'s medically determinable impairment(s) and
> related symptoms) are not factors in assessing RFC. . . .

*Id*. at 34,476.

To assess a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements. *Id*. at 34,477. SSR 96–8p specifically states, "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id*. at 34,478. Thus, an ALJ's RFC assessment will necessarily entail assessing the credibility of any alleged limitations, including assessing the credibility of testimony offered by the claimant. And, this Court recognizes that the ALJ is not required to specifically refer to every piece of evidence in his decision, but the ALJ must provide a statement of the case setting forth a discussion of the evidence and explaining reasons upon which the determination is based. *See Reid v. Comm'r*, 769 F.3d 861, 865 (4th Cir. 2014).

Upon review, the ALJ sufficiently discussed the medical and other evidence before him, provided a statement of the case, and explained the reasons for his RFC finding and the finding that Plaintiff could perform her past relevant work as a housekeeper. And, the ALJ's factual findings are supported by substantial evidence of record.

Although Plaintiff contends that the ALJ erred in finding Plaintiff's borderline intellectual functioning did not limit her in her ability, this is simply not the case. Specifically, the ALJ considered the school testing records that showed Plaintiff had a

mental handicap.  Because Plaintiff had a demonstrated ability to perform substantial gainful activity, the ALJ reasonably found that Plaintiff had only borderline intellectual functioning as opposed to "an intellectual disability."  Then, the ALJ accounted for the mental ability in the RFC by limiting Plaintiff's work to simple, routine, repetitive tasks in an environment where changes are infrequent and are introduced gradually.  Moreover, the ALJ's decision is supported by substantial evidence because Plaintiff's January 2013 description of her daily activities showed that she could drive, cook, do laundry, clean the house, grocery shop—which is inconsistent with an intellectual disability that would interfere with work.

Plaintiff's argument that the ALJ erred in determining the RFC by failing to discuss the September/October 2013 genetic mutation testing is not supported by substantial evidence.  Dr. Olson's genetic testing that showed Plaintiff had duplication of 2q37.3 associated with learning disabilities, mental and learning disabilities, would not have changed the outcome of the RFC.  The RFC already accounted for Plaintiff's mental ability by only requiring her to perform simple, routine, repetitive task work without many changes.  As noted, the law does not require the ALJ to discuss every piece of evidence in the decision.  Further, Dr. Olson's notes showed that Plaintiff denied "any medical concerns at this time." Thus, Dr. Olson's notes actually demonstrated in part that Plaintiff's medical impairments did not cause her any problems in October of 2013.

As to Plaintiff's argument that the ALJ erred at Step 4 by finding that Plaintiff could perform her PRW as a housekeeper and erred by failing to ask the VE how the borderline intellectual functioning would have affected Plaintiff, there is no error.  PRW is work that a claimant has done within the past fifteen years, that was substantial gainful activity

("SGA"), and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1565(b)(1).  SGA is defined as work activity, even if such work is done on a part-time basis for less pay or with less responsibility than previous work, that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572.

The ALJ determined that Plaintiff had stated she lost her most recent job when she took time off after her mother passed away, as opposed to stopping work due to her inability to perform it. [R. 93.]  To be eligible for disability benefits, a person must be unable to engage in SGA.  The ALJ found that Plaintiff had reported that she worked doing cleaning and janitorial work full-time for several years. [R. 96.]  The ALJ then determined:

> The vocational expert testified at the hearing that this work could be classified as that of a housekeeper (DOT# 323.687-014, light exertional level, SVP 2). The undersigned finds that pursuant to the regulations, the claimant's work as a housekeeper constitutes past relevant work. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. The vocational expert specifically testified that an individual of the claimant's age, work experience, education and residual functional capacity could perform work as a housekeeper.

[R. 96.]  Based on the VE testimony, the ALJ determined that Plaintiff had the RFC to perform the requirements of her PRW as a housekeeper.

A review of the VE's testimony shows that although the ALJ did not specifically ask whether Plaintiff's borderline intellectual functioning would have affected her ability to work, the RFC did account for Plaintiff's borderline intellectual functioning (as discussed above) and testimony at the hearing showed that Plaintiff went through a special education program in school, did not obtain a GED, had poor ability to read, problems with spelling,

28

and she could add numbers. [R. 107–08.] The VE testified that an individual with Plaintiff's same education, age, and vocational background with the RFC as noted above could perform the job of housekeeper that Plaintiff had done previously. [R. 122–23.] The VE specifically stated, when asked about a person who could not read or spell above the third grade level, that Plaintiff could do the housekeeping job as she had demonstrated in her past because there is no high level of education required. [R. 123–24.] Accordingly, the Court finds that the VE was aware of Plaintiff's lower education; and, the hypothetical questions sufficiently accounted for Plaintiff's borderline intellectual functioning. Thus, the ALJ's decision to rely on the VE testimony is supported by substantial evidence.

**Records Submitted to the Appeals Council**

Plaintiff argues the Appeals Council should have considered additional records that were submitted. [Doc. 25.] She contends that the new records were not duplicative nor cumulative, referred to her prior condition, and would have changed the outcome. [Doc. 30.] However, the Commissioner argues the Appeals Council did not err when deciding to deny Plaintiff's request for review. [*Id.*] The Court agrees with the Commissioner.

### *Relevant Medical Records*

*After* the ALJ's decision dated June 13, 2014, Plaintiff submitted the following medical records to the Appeals Council.

On July 9, 2014, Plaintiff was seen on follow up at Lowcountry Hematology & Oncology after recovering from a right breast cancer and mastectomy. [R. 488.] It was noted that Plaintiff had recovered from the breast cancer and surgery; she was placed on

tamoxifen; her ankles had pain and swelling. [*Id*.] She appeared healthy and in no acute distress. [*Id*.]

Dr. Samuel H. Rosen, MD ("Dr. Rosen") saw Plaintiff on July 2, 2015, for anxiety and some depression. [R. 10–14.] Plaintiff reported that she had been unable to work due to anxiety and depression; it was noted that she had some symptoms of PTSD. [R. 13.] Dr. Rosen changed Plaintiff's medications from Xanax and citalopram to diazepam (if needed for anxiety) and fluoxetine. [R. 14.] Plaintiff's speech and thought process were normal and her concentration was decreased mild.

Dr. Robinson's records showed that he treated Plaintiff on September 25, 2014, for follow up; she was requesting a handicapped sticker. [R. 52.] He noted Plaintiff had headache, anemia unspecified, GERD, and chronic laryngitis. [*Id*.] He requested a temporary six-month disabled placard from the DMV due to Plaintiff's limitation on her ability to walk. [R. 70.] On re-check on June 12, 2015, Plaintiff had headache, anxiety, depression, and polyarthralgia. [R. 17–19.] On or about May 12, 2015, Dr. Robinson requested a temporary one-year disabled placard from the DMV due to Plaintiff's limitation on her ability to walk. [R. 37.]

On January 14, 2015, Plaintiff saw Jeffrey S. Rose, MD ("Dr. Rose"), with Lowcountry Hematology & Oncology; he noted Plaintiff was doing relatively well overall although having some issues with lower extremity aches and pains. [R. 57–58.] It was also noted that she had migraine headaches. [R. 58.]

On October 15, 2014, Dr. Olson saw Plaintiff on follow up; he noted that Plaintiff had been unsuccessful in obtaining medical disability assistance. [R. 61–62.] He noted that since he had seen her, Plaintiff underwent treatment for breast cancer with right

mastectomy. [*Id*.] He noted that Plaintiff had mental retardation with speech and learning disabilities. [*Id*.] Further, Dr. Olson stated, "Venisha is in need of and would benefit from medical disability assistance and appears to meet criteria with multiple medical issues limiting her ability to sustain employment and obtain adequate financial support. Documented genetic mutation associated with Mental retardation clearly is a significant nonreversible medical disability." [*Id*.]

### *The Appeals Council's Denial of Request for Review*

On July 29, 2015, the Appeals Council notified Plaintiff that it made a part of the record "Lowcountry Hematology and Oncology Records (Dated from February 3, 2014 to July 9, 2014)." [R. 6.] The Appeals Council concluded that the additional evidence did not provide a basis for changing the ALJ's decision. [R. 2.] It further stated:

> We also looked at the South Carolina DMV records dated September 25, 2014 (2 pages) and March 12, 2015 (3 pages), Roper St. Francis records dated August 21, 2014 (4 pages), September 25, 2014 to January 27, 2015 (6 pages), March 13, 2015 (4 pages), April 27, 2015 (7 pages), January 24, 2015 to May 13, 2015 (9 pages), June 11, 2015 (4 pages), June 12, 2015 (4 pages), and July 2, 2015 (8 pages), MUSC Health records dated October 15, 2014 (10 pages), and Lowcountry Hematology and Oncology records dated January 14, 2015 (4 pages) and June 10, 2015 (2 page). The Administrative Law Judge decided your case through June 13, 2014. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before June 13, 2014.

[R. 2.]

*Discussion*

After the ALJ renders a decision, a claimant who has sought review from the Appeals Council may submit evidence to the Appeals Council as part of the process for requesting review of an adverse ALJ decision. 20 C.F.R. § 404.968; *see also id.* § 404.970(b) (stating that the Appeals Council will consider new and material evidence). In *Meyer v. Astrue*, the Fourth Circuit held that

> the regulatory scheme does not require the Appeals Council to do anything more than . . . "consider new and material evidence . . . in deciding whether to grant review." *Wilkins* [*v. Sec'y, Dep't of Health & Human Servs.*], 953 F.2d [93,] 95 [(4th Cir. 1991)]; *see also Martinez v. Barnhart*, 444 F.3d 1201, 1207–08 (10th Cir. 2006) (finding "nothing in the statutes or regulations" requires the Appeals Council to articulate its reasoning when "new evidence is submitted and the Appeals Council denies review"); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992) (rejecting contention that Appeals Council must "make its own finding" and "articulate its own assessment" as to new evidence when denying review); *Damato v. Sullivan*, 945 F.2d 982, 988–89 (7th Cir. 1992) (holding that "the Appeals Council may deny review without articulating its reasoning" even when new and material evidence is submitted to it).

662 F.3d 700, 706 (4th Cir. 2011) (footnote omitted). However, the court went on to note,

> Although the regulatory scheme does not require the Appeals Council to articulate any findings when it considers new evidence and denies review, we are certainly mindful that "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review." *Martinez*, 444 F.3d at 1207–08; *see also Damato*, 945 F.2d at 989 n.6 (noting that in "fairness to the party appealing the ALJ's decision, the Appeals Council should articulate its reasoning" when it rejects new material evidence and denies review).

*Id.*

The Fourth Circuit then observed that a lack of additional fact finding by the Appeals Council would not render judicial review impossible if the record contained an adequate explanation of the Commissioner's decision. *Id.* at 707 (citation omitted). In such a case, a court could conclude that, even considering the new evidence, the ALJ's decision was supported by substantial evidence. *See id.* (citation omitted). On the other hand, if the newly presented evidence was not controverted by other record evidence, the new evidence could support finding that the ALJ's decision was not supported by substantial evidence. *See id.* (citation omitted).

Here, Plaintiff contends the following evidence was important to show that Plaintiff had restrictions on her ability to walk or stand and bilateral ankle pain with swelling: Dr. Robinson's completion of DMV forms for a disabled placard on September 25, 2014, for a temporary six month request, and on May 12, 2015, for a temporary one year request; and Dr. Barron with Low Country Hematology's record post-mastectomy showing Plaintiff with bilateral ankle pain with swelling. [*See* R. 37, 70.] Plaintiff also relies on Dr. Olson's notes from October 15, 2014, documenting Plaintiff's disability due to her "multiple medical issues." [*See* R. 62.]

First, none of those records was material to Plaintiff's ability to work on or before June 13, 2014; they do not appear to relate back in time. And, most evidence in the record before the ALJ showed no problems with Plaintiff's ability to walk or ankle pain [e.g., in December of 2013, she had completely healed from breast cancer and surgery with no restrictions; and her other medical appointments prior to June 13, 2014, related mainly to Plaintiff's hoarseness, reflux, and anxiety (controlled by medication)], and Plaintiff did not claim to be disabled due to inability to walk or stand. Of course, there was some evidence

33

before the ALJ that Plaintiff suffered from fatigue due to anemia, and the ALJ considered it.

Further, Dr. Olson's October 15, 2014, note, which Plaintiff alleges is the most important record the Appeals Council failed to consider [Doc. 25 at 10], also was not material because it would not have changed the outcome. Dr. Olson stated, "Venisha is in need of and would benefit from medical disability assistance and appears to meet criteria with multiple medical issues limiting her ability to sustain employment and obtain adequate financial support. Documented genetic mutation associated with Mental retardation clearly is a significant nonreversible medical disability." This medical opinion, however, is merely a statement that Plaintiff is disabled; that issue is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e) (stating an ALJ does not have to "give any special significance to the source of an opinion on issues reserved to the Commissioner," such as an opinion that the claimant is disabled, the claimant's impairment or impairments meets or equals a listing, or the claimant has a certain residual functional capacity). Dr. Olson did not describe any functional limitations on Plaintiff's mental abilities that were caused by a genetic mutation.

This Court finds that the Appeals Council did what *Meyer* requires; it considered the new evidence in deciding whether to grant review. There is no error with the Appeals Council's decision to deny review of Plaintiff's case because it found no basis for changing the ALJ's decision. And, substantial evidence supports the Appeals Council's decision because the new records did not refer to Plaintiff's condition prior to June 13, 2014, and in any event the records would not have changed the outcome.

## <u>CONCLUSION AND RECOMMENDATION</u>

Wherefore, based on the foregoing, it is recommended that the decision of the Commissioner be affirmed.

IT IS SO RECOMMENDED.


s/Jacquelyn D. Austin
United States Magistrate Judge

October 31, 2016
Greenville, South Carolina